# Richmond

## J. H. OWEN v. RUBY PULLIAM OWEN.

April 8, 1940.

Record No. 2207.

Present, All the Justices.

The opinion states the case.

*W. E. Neblett* and *R. S. Weaver, Jr.,* for the appellant.

*W. Moncure Gravatt,* for the appellee.

GREGORY, J., delivered the opinion of the court.

A suit for divorce was instituted by Ruby Pulliam Owen against her husband, J. H. Owen, grounded upon allegations of his desertion and cruelty. He denied the charges but the court after hearing the evidence *ore tenus* granted the wife a divorce *a mensa et thoro* and awarded her permanent alimony of $25.00 per month. The appellant challenges the decree of the court which effectuates its decision.

At the time of this marriage the appellant was a widower, forty-eight years of age, an extra brakeman of the Virginian railway, and was living at a hotel in Victoria. The appellee was twenty-nine years of age, employed at the silk mill in Victoria, and resided with her parents. She and the appellant had known each other for a number of years and on February 12, 1938, they were secretly married. They did not live together when they were first married but after their marriage became known to the parents of Mrs. Owen they lived together as man and wife in the home of Mrs. Owen's parents.

This marriage was not a happy one. It was of short duration, for on July 11, 1938, they separated and since that time they have not lived together. No children were born of the marriage.

After living together for three weeks they began to have domestic troubles and just before Easter of 1938 Mr. Owen packed his suit-case and left home. After he left, Mrs. Owen went to Richmond to visit a cousin who had just been married. Later Mr. Owen returned home, and not knowing his wife's whereabouts, set out to look for her. She had spent a few days in Richmond, and was waiting for a bus, upon which she intended to return home, when her mother and Mr. Owen drove up. They drove home together and resumed their married life.

Some three weeks later Mrs. Owen and her mother attempted to meet Mr. Owen around 9:30 P. M. when he came in from his "run," but Mr. Owen went on home and left them waiting. When Mrs. Owen reached home she found him there. She says, "He almost knocked me down; he threatened to choke me and I had to run across to my

brother's room and he followed me; when he saw my brother was there he went out and got in his car, and when I got up the next day, he had taken the suit-case and gone off * * * ." Later he returned and they again resumed their married life.

On July 11, 1938, he again left. This was the final break, and Mrs. Owen gives the following account of it: "The next time he left on Sunday, he was called to work and we had planned Saturday morning to go to Moore's Lake and spend the day, but they called him and he seemed perfectly satisfied for me to go with my mother to Moore's Lake, but when we got back Sunday evening, he did not speak to me at all and I asked him if he had eaten his supper, he said yes, I came in hot and tired and did not have anything to eat. I said, well, I left plenty in the ice box downstairs and I said I left a note for you under your hair brush, because first thing he would brush his hair, he said he had not seen the note and I went to look for it and I could not find it. He never gave me any money to spend and I had to account to him for it. I would stay home or either have a fuss. Around 9 o'clock I went to bed and he got mad and said I did not pay him any attention and he would break my neck, but what I would do what he wanted me to do. I went downstairs and just as I got to the door, he said I was commoner than 'hell'. I spent the night in her room. I said Mr. Owen is having another one of his spells. The next morning I fixed his breakfast and he told me he had eaten his breakfast and did not want any, that he was leaving and wasn't coming back. He walked out and left. I guess it was lunch time, Mr. Millican came over and got the trunk."

Since that time they have not lived together, though he has made several unsuccessful attempts to effect a reconciliation.

Mrs. Owen testified that her husband had beaten her "with his fist and caught me by the throat and threatened to choke me and both times I had to leave the room." Upon one occasion she ran to her brother's room and upon the

other she went to her mother's room, where she spent the night. Mr. Owen ran her out of their room and said she "was commoner than hell." The next morning she showed her mother the bruises on her back and shoulders which had been inflicted by her husband. Mrs. Owen is corroborated by her mother in the substantial details regarding the charges of cruelty. The allegation of desertion is corroborated by the surrounding circumstances.

The record presents but one question and that is whether the evidence sustains the decree. In *Allen* v. *Allen*, 166 Va. 303, 186 S. E. 17, and many other cases, this court has held that where the evidence in a divorce suit is heard *ore tenus* by the court its decree has the force and effect of a judgment rendered upon the verdict of a jury. It will not be overturned by this court unless it is plainly wrong or is not supported by the evidence.

We do not think that the appellant has borne the burden resting upon him of showing that the decree is plainly wrong or without evidence to support it.

No issue has been raised as to the amount of the alimony. It seems reasonable under the circumstances. Upon the record we are of opinion that the decree should be affirmed.

*Affirmed.*