# Richmond

## WILLIAM ERNEST ARRINGTON v. VANNA BRYANT VALENCHES ARRINGTON.

June 21, 1954.

Record No. 4220.

Present, All the Justices.

The opinion states the case.

*Oliver & Padgett* and *Albert O. Burks,* for the appellant.

*Robert C. Goad* and *John D. Easley*, for the appellee.

SPRATLEY, J., delivered the opinion of the court.

On August 19, 1952, William Ernest Arrington instituted this suit for divorce against Vanna Bryant Valenches Arrington. In his bill he charged the defendant with wilful desertion for more than one year. He alleged that upon her departure she demanded a property settlement; and that in order to avoid unpleasantness and to arrange a settlement of their respective property rights, they entered into a written agreement on November 13, 1950, under which he paid her $6,000 cash, and gave to her certain personal property, in consideration of which she released him of any further obligation to support her and waived any and all rights in his property.

The wife filed an answer in which she denied the charge of desertion; asked that the agreement, mentioned above, be set aside and cancelled, (Virginia Code, 1950, § 20-109), because it was a contract to separate, and as such contrary to public policy; and prayed that a divorce be denied her husband and she be awarded a reasonable allowance for her support and maintenance. She did not ask for a divorce; but on the other hand, averred that she had desired, and still desired, to maintain full marital relations with the complainant.

On May 5, 1953, the trial court set aside the agreement as null and void, on the ground that it was, in effect, a contract to facilitate a separation and promote a divorce; denied a divorce to the complainant; awarded the defendant the sum of $50 per month alimony, beginning May 5, 1953; and dismissed the cause with leave to reinstate on the question of support and maintenance of the wife.

The cause was heard *ore tenus* by the trial court, except for the short deposition of one witness, too ill to appear in

court. This witness, Walter O. Arrington, a brother of the complainant, testified that he "thought" the defendant left her husband about 1950, and he had heard of no subsequent reconciliation. The evidence relating to the procurement and execution of the separation agreement consists wholly of the testimony of the complainant and the defendant, and like all of the pertinent matters and circumstances of the case is in hopeless conflict.

[■ The chancellor resolved the conflicts in favor of Mrs. Arrington, and, therefore, the finding of the court has the force and effect of a verdict of a jury and settles all questions of disputed fact in favor of the wife. *Allen* v. *Allen*, 166 Va. 303, 304, 186 S. E. 17; *Owen* v. *Owen*, 175 Va. 245, 248, 7 S. E. (2d) 890; *Forbes* v. *Forbes*, 182 Va. 636, 640, 29 S. E. (2d) 829; *Lowdon* v. *Lowdon*, 183 Va. 78, 79, 31 S. E. (2d) 271; *Collins* v. *Collins*, 183 Va. 408, 412, 32 S. E. (2d) 657; *Crump* v. *Gilliam*, 190 Va. 935, 940, 59 S. E. (2d) 72; *Henrico* v. *City of Richmond*, 177 Va. 754, 782, 783, 15 S. E. (2d) 309, and cases cited.

The evidence stated, as it must be, in the light most favorable to the wife shows these facts:

The parties to this suit were married on September 5, 1948. At that time Arrington was a bachelor sixty-six years old, and the defendant a widow forty-three years of age. Arrington was a farmer residing in Bedford County. The defendant was living in the same county in the home of a brother of the complainant. She had been formerly married at the age of eighteen. Her first husband was a disabled veteran of World War I, who died in 1938. As a widow she received a pension of $42 per month from the United States Government. She knew that the pension would be discontinued upon her marriage. Arrington told her that he would purchase her a home if she would marry him. In accordance, she assisted him in negotiations which resulted in his purchase of a farm in Bedford County, in April, 1948, the farm being sometimes hereinafter referred to as the "Lupton Place." She said that he led her to believe, in

accordance with his premarital promise, that he had arranged the purchase so that she would own at least a one-half interest therein.

Immediately after their marriage, the parties moved to the Lupton farm, and there lived happily together with little or no disagreement until May, 1950. She performed the usual duties of a housewife, cooked the meals, cleaned the house, and, in addition, improved the building by plastering and painting some of the rooms. At her insistence, Arrington installed fixtures which provided running water in the home. She also begged him to install a bathroom, but was never able to persuade him to do so.

Arrington was an uneducated man, not able to read or write, and his wife attended to his correspondence, took care of his bookkeeping, and made his bank deposits and withdrawals. She gave personal attention to him, "cut his hair and toenails, and bathed and shaved him." She gave him a good name, and thought that he was "a very fine man;" but "pretty tight" with his money. She said that "We had very few cross words in our entire life. If I could have had Mr. Arrington alone, we'd be together today." She was under the impression that some members of her husband's family interfered with their affairs.

The first real rift in their marital relations occurred in May, 1950, when the parties went to the Town of Bedford to close the arrangements for a sale of their home. When the instruments relating to the sale were shown to Mrs. Arrington, she discovered that the home had been conveyed to her husband alone, and that she was not to receive any portion of the sale price. She refused to sign a deed of conveyance and negotiations for the sale were discontinued. Mr. and Mrs. Arrington then returned to their farm home, and continued to live together in the house until the following November. It is conceded by Arrington that his wife continued to perform her wifely duties and ministrations.

Mrs. Arrington said that after the sale of the farm fell

through, her husband frequently suggested and insisted upon a separation agreement. He kept asking her "all the time": "What would you take to leave here; what would you take to leave here right now?" Finally, on the night of November 12, 1950, in their bedroom they discussed the terms of a separation agreement. On the following day they went to the office of an attorney where the agreement as to their separation and property rights was drawn and executed on the same day.

The agreement, attached to complainant's bill as an exhibit, contains the following recital:

"WHEREAS, differences have arisen between the parties hereto, on account of which they have separated and now live apart, and intend to live apart from each other for the rest of their natural lives."

It then sets out that the husband had paid $6,000 in cash to his wife, and had given her a studio couch, a sewing machine, and a Studebaker truck to which she held title, in consideration of the release of her husband from any duty or obligation of furnishing her with maintenance and support. It further contained a waiver by each party of all and every right in the property of the other. The agreement was recorded in the clerk's office at two p. m. on the same day, and Mr. and Mrs. Arrington returned to the Lupton farm where they spent the night together as usual.

The next day Mrs. Arrington left the farm, carrying with her most of her personal property. Except for brief visits to dispose of poultry or some farm produce, she did not return. Arrington continued to reside on the farm until he sold it in February, 1951, when he moved to the home of his brother, Walter O. Arrington. While he was living at his brother's home, the defendant frequently visited there, staying sometimes for periods of six or seven weeks. While there, she waited on Mr. Arrington, and they continued the normal relations of a man and his wife. During the whole period between the execution of the separation agreement on November 13, 1950, and the institution of this suit on

August 19, 1952, she said that, while they slept in different beds in different rooms, she frequently visited him in his room and there they cohabited as man and wife.

That the parties were on friendly and affectionate terms is evidenced by Mrs. Arrington's statement that "he kissed me goodbye," when he left his brother's home, on the morning of the day in which she was later served with the process instituting this proceeding.

Shortly after receiving the $6,000 from her husband, Mrs. Arrington purchased a house and lot in Charlottesville. She sold that property ninety days later, went back to Bedford County, asked her husband to take the $3,900 which she had received from the sale, add to it an amount sufficient to buy ten or twelve acres with a house on it, and let her return there and live with him. He refused.

Her efforts towards a reunion in a home of their own were so persistent that Arrington told her, according to his own testimony: " 'Vannie don't come running after me now; I've left you and we've settled up, and don't come running after me.' I said, 'We've separated—.' And I stuck to it."

Asked if he thought it was proper for her to be chasing after him, he replied: "That's right; chased after me. I wasn't chasing after her, and she was chasing after me."

Mere separation by mutual consent is not a desertion by either party. *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, 326.

When a separation of husband and wife is by agreement or where the husband assents to, or acquiesces in, the wife's separation from him, he cannot maintain a suit for divorce on the ground of desertion. A separation by mutual consent does not amount to desertion or abandonment in the law. *Devers* v. *Devers*, 115 Va. 517, 79 S. E. 1048; *Butler* v. *Butler*, 145 Va. 85, 90, 91, 133 S. E. 756; *Lowdon* v. *Lowdon, supra; Bacon* v. *Bacon*, 68 W. Va. 747, 70 S. E. 762; *McCoy* v. *McCoy*, 74 W. Va. 64, 81 S. E. 562; 6 M. J., Divorce and Alimony, § 18, page 276; 17 Am. Jur., Divorce

and Separation, § 88, page 194; 27 C. J. S., Divorce, § 38, page 572.

In *Devers* v. *Devers, supra,* Judge Whittle, speaking for the court, said:

"The well being and good order of society demand that husbands and wives shall in good faith endeavor to reconcile their differences and dwell together in unity and peace, rather than to make occasion for resort to the courts for redress. It is against public policy to encourage such litigation, and it is not the province of a court to grant relief to a plaintiff whose misconduct has contributed to bring about, if indeed he did not connive at, the condition of which he complains." (115 Va. page 520.)

In *Butler* v. *Butler, supra,* the same views are expressed, and this statement from a Michigan case is approved:

"But desertion can only be complained of when it is against the will of the party who is deserted, and constitutes a grievance which deprives him of the society of his wife without his consent or acquiescence. If there be a separation by consent, that consent shows that the parties deem it no grievance to be deprived of each other's society, and nothing but an unconditional and entire resumption of their early relations can restore them to such a position as would make a new separation by the departure of the wife, as in this case, a criminal desertion." (145 Va. page 91.)

See also *Inman* v. *Inman,* 158 Va. 597, 164 S. E. 383.

The evidence fails to show that Mrs. Arrington deserted her husband so as to entitle him to a divorce. On the contrary, it shows that she left their home on November 13, 1950, by mutual consent. That her departure was agreeable to him is evidenced by the recitals and terms of their separation agreement. If the separation was, in fact, a legal abandonment of the husband by the wife, such as would entitle him to a divorce, the desertion itself would have defeated her marital claims upon his estate. If any further evidence were needed to prove her husband's consent to a

separation, it may be found in his own testimony that he did not wish her to return to him. The evidence, as a whole, shows that it was the husband who wanted a separation and not the wife.

Moreover, there was shown no pre-existing cause for a legal separation of the parties. The complainant does not allege in his bill, nor prove, any cruelty on the part of his wife as would justify the breaking off of their marital relations. She does not charge that he was guilty of cruelty on his part. He persuaded the wife to leave his home. He repeatedly refused her offers of reconciliation, and as he said himself "stuck" to his determination not to let her return to him, yet he continued to avail himself of the privilege of the marital relation.

The evidence supports the conclusion of the chancellor of the trial court that the separation agreement was due to the importunities of the husband, and that its object and purpose were to facilitate a separation and promote a divorce. As such, it is plainly contrary to the public policy of this State and void.

The principles governing the validity of antenuptial and postnuptial contracts for separation and divorce are well settled in Virginia. They are clearly and concisely stated in *Cumming* v. *Cumming*, 127 Va. 16, 102 S. E. 572. While the facts in that case are somewhat different from those now before us, and an antenuptial contract was there under review, it was expressly held that the principles there stated and applied are the same as those which apply to postnuptial contracts.

In the above case, the following statement from 1 Bishop on Marriage, Divorce and Separation, § 1261, is quoted with approval:

" '* * since the law makes the public a party to every suit for dissolution or separation, and forbids either form of divorce on the mutual agreement of the parties * * any bargaining between them for a future separation, * * or

tending to the like end, being contrary both to the law and legal policy, is void.' " (127 Va. page 29.)

Proceeding, the court then said:

"As said in *Pereira* v. *Pereira, supra,* (156 Cal. 1, 103 Pac. 488, 23 L. R. A. (N. S.) 880, 134 Am. St. Rep. 107): 'Any contract between the parties having for its object the dissolution of the marriage contract *or facilitating that result* * * is void as *contra bonos mores.'* (Italics supplied.)"

The authorities relied on in complainant's brief do not in any way modify or change the law of Virginia with respect to agreements between husband and wife for the purpose of facilitating a separation. It is true that such contracts are held valid in some jurisdictions where the general rule may have been modified or changed by statute. They are held valid in most cases only where they contemplate an immediate separation for some ground existing prior to the contract which is sufficient of itself to bring about the separation. *Cumming* v. *Cumming, supra,* 127 Va. page 30.

In *Smith* v. *Smith,* 225 N. C. 189, 34 S. E. (2d) 148, 160 A. L. R. 460, the North Carolina court upheld a separation deed, whereby a wife surrendered dower and all personal and property rights against her husband because it complied with the statutes of that State.

*Roberts* v. *Pace,* 193 Va. 156, 67 S. E. (2d) 844, is not in point here. In that case, the surviving husband sought to abrogate a postnuptial property settlement, ratified and confirmed in a decree granting his wife a divorce *a mensa et thoro,* on the ground that there had been a reconciliation of the parties before the wife's death. His contentions were denied.

In *Shelton* v. *Stewart,* 193 Va. 162, 67 S. E. (2d) 841, Mr. Justice Miller cited with approval the following statement from 17 Am. Jur., Divorce and Separation, § 14, page 156:

" 'The rule is well established that any agreement whether between husband and wife or between either and a third person intended to facilitate or promote the procurement of a

divorce is contrary to public policy and void. Though an agreement made is contemplation of a divorce often contains other provisions which, standing alone, are not invalid, yet when the general purpose of the agreement or some of its provisions is to facilitate the procuring of a divorce, the courts notwithstanding the existence of legal grounds for divorce, have refused to enforce any part of the agreement.' " (193 Va. page 165.)

In Keezer on Marriage and Divorce, §184, page 230, we find:

"Contracts to facilitate divorces are in derogation of marriage and are very generally held invalid on grounds of public policy."

In 2 Bishop on Marriage, Divorce and Separation, § 696, page 286, this is said:

"Therefore any agreement for divorce, or any collateral bargaining promotive of it, is unlawful and void."

See also *Wallihan* v. *Hughes* and *Anderson* v. *Anderson* this day decided and annotation 130 A. L. R., page 1008, *et seq.*

Counsel for the wife asks us to allow him additional fee for his services in this court, to be paid by the husband. He was allowed a fee of $250 by the trial court, which has been paid. Complainant asks us to take into consideration, in fixing the amount of the additional fee, the fact that the wife has received the sum of $6,000.

The wife, upon her marriage to complainant, surrendered her right to a regular income of $42 per month from the United States. The record shows that her husband has a net estate of more than $38,000. In view of the respective ages of the parties, the marital rights of the defendant are substantial. During the period between November, 1950, and the institution of this suit in 1952, she is not shown to have had any employment or income, and, so far as we know, $3,900 is all that she had when she undertook to effect a reconciliation with her husband, and out of that she had to expend the costs of living.

Taking all of the circumstances in consideration, we fix the amount of the additional fee at $150, which will be allowed. The husband in prosecuting this appeal has made necessary the additional expense incurred by the defendant. The award of $50 per month alimony is not unreasonable.

The decree appealed from will be modified to the extent of providing for the additional counsel fee, and as so modified will be affirmed.

*Affirmed.*