# 𝔖taunton

Frederick S. Todd v. Nancy Royce Todd.*

September 2, 1960.

Record No. 5094.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Edward R. Parker (Leith S. Bremner; Bremner, Neal, Harris, Williams & Battle,* on brief), for the appellant.

---

\* Petition for rehearing awarded November 28, 1960; opinion withdrawn and cause dismissed agreed January 17, 1961.

*Alexander H. Sands, Jr.* and *Frank H. Pitchford (Sands, Marks & Sands,* on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

On August 22, 1956, appellee, Nancy Royce Todd, filed a bill against appellant, Frederick S. Todd, charging him with cruelty and constructive desertion as of August 15, 1956. Summarized, her allegations are that her husband was abusive, unjustifiably had a lunacy warrant issued against her, falsely accused her of criminal offenses, and failed to provide a proper home for her and their two children, though amply able to do so. She prayed for a divorce *a mensa et thoro,* alimony, custody and support of the children, and counsel fees.

In Todd's answer he asserted that the lunacy warrant was obtained on advice of two psychiatrists, denied that he abused, mistreated, deserted or was cruel to appellee or failed to support her and the children. In a cross-bill he alleged that appellee had been cruel to him by relentless nagging; by constantly scheming to humiliate and irritate him; was avaricious, domineering and persistent in her efforts to extract money from him and had deserted him in August, 1955.

The testimony offered by the litigants at an *ore tenus* trial held January 12, and 13, 1959, is voluminous; some of it is conflicting and much irrelevant.

The chancellor found that appellant and appellee had lived in a state of separation since about the 23 day of August, 1955, but concluded that neither was entitled to a divorce. In the decree entered March 24, 1959, denying a divorce, custody of the children, Fred, aged 18 years, and Nancy, aged 16 years, was awarded appellee. An order of September 12, 1956, that required Todd to pay $110 per week alimony and support money was amended and the payments reduced to $75 per week. A fee of $500 was allowed counsel for appellee in addition to $250 theretofore awarded.

Both litigants excepted to the decree, and we granted Todd an appeal. No petition for appeal was filed by appellee, nor has she assigned cross-error. Several assignments of error were taken by Todd but the questions presented are whether or not there is credible evidence to sustain the findings of the chancellor that appellant is not entitled to a divorce and that appellee is entitled to alimony.

During 1938 appellant, then 31 years old, met Nancy Reyna Royce,

mother of three sons by her husband, Mr. Royce. Thereafter appellant paid appellee's expenses incident to a trip to Mexico where she obtained a divorce from Royce in July, 1939, and Todd then flew to Mexico where he and appellee were married on July 25, 1939. In September, 1939, appellant purchased a home in Rochester, N. Y., where he, appellee, and her three children lived. These children were supported by Royce but lived with appellant and appellee for some time. One died in 1954, and the other two have reached maturity.

From 1941 to 1945 appellant did engineering design work for Eastman Kodak Company, but being dissatisfied and having received a considerable inheritance from his father some years previously, he gave up his employment to engage in farming. Between April, 1944, and 1947, he purchased three farms in New York known as "Ontario farm", "Webster farm", and "Williamson farm", and took title to them jointly with his wife. Shortly after Todd started farming, without his knowledge, appellee had a general power of attorney drawn that would allow her to handle all of his business and property. Appellant refused to sign this instrument, and appellee took umbrage and exhibited an inclination and desire to dominate and control his business and farming activities.

According to appellant's testimony, as time went on she became more insistent and disagreeable in her manner, tactics and conduct toward him, and their relations and contacts seemed to have become more strained and unpleasant.

On March 31, 1949, appellant, appellee and their children, while returning to their farm at Williamson from an extended southern trip, were involved in an automobile accident near Buffalo, N. Y. Todd and his wife were seriously injured and hospitalized for four months. He was forced to use crutches for about three years and appellee's hand was permanently injured. Fred and Nancy were less seriously injured but were hospitalized for two months and two weeks respectively.

During December, 1949, the family went to Florida and lived there through the winter. In the spring of 1950 they returned to Williamson, N. Y., to harvest the cherry crop, but when Todd undertook to sell the crop a dispute arose because appellee considered the sale price too low. Upon sale of the crop appellee became angry and without appellant's knowledge took the money that he had put aside to pay

the cherry pickers and used it to go to New York City and Stamford, Connecticut.

In June, 1950, settlement of the personal injury claims incident to the automobile accident was effected for $133,000. Further disagreement arose on what part of the fund each should get; appellee insisted that she receive half of what remained after deducting portions agreed upon for the children. The attorneys suggested that $27,000 be allotted appellee, but upon her protest, Todd suggested that she receive $35,000, Fred, $12,000, and Nancy, $3,000. After allotment of these sums, payment of attorneys, doctors, and other expenses, the residue of $50,000 was paid to appellant, which he invested in securities. Other differences arose when appellant evidenced a desire that appellee likewise invest her $35,000 and they secure an investment consultant to handle the joint fund of $85,000 and use the income for maintenance of the family during the time of his incapacity. Appellee rejected this suggestion and asserted that appellant was trying to obtain her $35,000.

The relations had become so strained by August, 1951, that appellee consulted an attorney about obtaining a divorce, but the following winter she, appellant, and children went to Florida again and lived there awhile on a yacht called the "Denizen", which Todd had purchased. In the spring of 1952, appellee, without appellant's knowledge, purchased a house in Fort Lauderdale, Florida. The family lived there for about a month before returning to Williamson. In May of 1952, more friction arose from an incident involving their wills. Appellee testified that under an agreement each had executed a will making the other beneficiary, but she learned that Todd had changed his will by setting up a trust arrangement for her in his estate instead of allowing it to be paid directly to her upon his death though she had made no change in her will.

In the fall of 1952, appellant came to Newport News, Virginia, and obtained employment with the Newport News Shipbuilding and Dry Dock Company without previously advising appellee of that intention. When he wrote to her, she refused to come to Newport News to live with him. About two months thereafter she interviewed an attorney in Rochester, N. Y., who wrote appellant that she had consulted him about securing a dissolution of the marriage. However, before Christmas, 1952, appellee and children came to Newport News and the family lived together on the boat, "Denizen", for a

few days. The appellee went to Florida and there consulted another attorney relative to institution of divorce proceedings.

On January 23, 1953, appellee wrote to Todd from Florida and said that she would never use her accident money for living expenses but would expect him to give her and the children what it would "cost just to live," and that "I am not leaving here until I have my divorce." Six weeks later appellant received a letter from J. E. Morris, Jr., an attorney in Fort Lauderdale, Florida, saying appellee had consulted him and he wished to know what would be Todd's position if she filed "for a divorce." When asked what she "had in mind when" she consulted this attorney, she said:

"A. I had one thing in mind when I went to see all these lawyers and it cost me a great deal and that is to get their opinion on some- thing that could bring our marriage together. * * *

"I did not want a divorce and I—that's why people thought I was very peculiar. I would come to them and I would say I don't want a divorce but I do want something done to straighten things out."

In April, 1953, appellee and the children came back and lived with Todd in Virginia for about two weeks. Thereafter she returned to their Williamson farm, and on August 22, 1953, Todd wrote her and expressed hope that she would "be able to arrange things so that she could come down with the family to Newport News soon." In September, 1953, appellee came to Newport News and the family lived together until difficulty arose with the landlord, and appellee then took the children to Florida.

Appellant then consulted a family counseling service and later discussed his problems with a psychiatrist; upon Mrs. Todd's return to Newport News, the psychiatrist conferred with her. He said appellee evidenced hostility toward her husband, had a feeling of being maligned and wronged by him, lacked insight, exhibited poor judgment, and seemed to be unrealistic in business affairs. He concluded that she had a "paranoid condition" which is difficult "to overcome because a person just doesn't believe they are ill," and that she suffered from an overwhelming desire to dominate her husband.

On June 1, 1954, the litigants, having sold their Williamson farm, moved to Newport News, Virginia, where appellee bought and sold some real estate. More friction arose because each refused to sign deeds conveying their respective properties. In March, 1955, appellee, being incensed at Todd's refusal to join in a deed, hid his clothes, wallet and car keys for two or three hours. Though he

persisted in his refusal to sign the deed, she relented and returned his clothes and possessions so that he could go to work.

After this incident Mrs. Todd was examined by another psychiatrist who confirmed the former diagnosis and recommended that she be committed to a hospital for treatment. On April 22, 1955, Todd secured the issuance of a lunacy warrant but never had it served.

In July, 1955, appellee acquired a cottage at Buckroe Beach in which the couple and the children took up their abode, but on August 15, 1955, she and the children went to Stamford, Connecticut, where they stayed for about a year. When Todd visited them, divorce papers were served on him in the office of an attorney who represented appellee in Connecticut. She testified that she went to Stamford after she learned that it was her husband who obtained the lunacy warrant, and she explained her actions as follows:

"A. Well I—I never in my life had been more amazed and more surprised or never had anything hurt me more than that. I never thought he would do a thing like that * * * [B]ut every once in a while something would come up and he'd say, 'you're crazy. You ought to be in an institution. You ought to be locked up' and after he had made several references that summer about that I decided I was going to leave and go and find out if I was crazy or I wasn't and have it put on record so I didn't intend to stay—I only wanted to leave for perhaps two or three weeks."

On cross-examination she said:

"I didn't take bag and baggage. I didn't even take clothes. I didn't expect to be gone more than two or three weeks. * * *

* * * * * * *

"I didn't desert him. He forced me to go. He didn't want us there. He and you, between you, forced me to go and I tried to come back. I begged him to try to patch up things and you and he together have decided to get rid of me. * * *"

When in Stamford she consulted a psychiatrist, and she said that when he informed her that there was nothing wrong with her, she was indignant with Todd for having sworn out the lunacy warrant and she then instituted the divorce suit.

In June, 1956 while in Stamford appellee, under the assumed name of "John F. Russell", negotiated with appellant to purchase his boat, the "Denizen," which he had offered for sale at $5,700. Todd, un-

aware that he was dealing with his wife, sold the boat to her for that sum and delivered it for "John F. Russell" in Connecticut where it was used by appellee for several weeks. After appellant learned who the purchaser was, he returned the $5,700 to her, and the boat was conveyed back to him.

In early August, 1956, appellee and the children returned from Stamford to Buckroe Beach, Virginia, and she, Todd, and the children occupied their cottage for a few days until she instituted this suit for divorce against him on August 22, 1956. Nancy testified that they lived together at Buckroe Beach at this time for about a month.

Appellee said that at times Todd drank to excess and would then tell her that she was "crazy" or of unsound mind, was rude to her, the children, and company and once threatened her son, James, with a gun. According to her, Todd not only at times inflicted physical cruelty upon her by twisting her arm and squeezing her injured hand, but made remarks to hurt and wound her, and was cold and indifferent. She described his conduct thus:

"He continued to twist my arms and push me around and hit me but mostly when he was drinking, not when he was sober, he acted more and more as if he didn't want me there, didn't want me around.

\* \* \* \* \* \* \*

"When he told me that I was—that I had turned into an ugly old woman; that the accident had aged me. My hair did turn gray after the accident and I did age a great deal and he said I had turned into an ugly sour looking old woman and I hate to be called old. \* \* \*"

Both children, witnesses for appellee, testified that appellant drank to excess at times and was then rude to his family, and on occasions he exhibited physical violence towards his wife by twisting her arm, and once he tried to shut the car door on her leg. They also confirmed her statement that at times he told her she was crazy, and when Fred was asked if appellee was upset when Todd obtained the lunacy warrant, he answered, "Yes, sir, very much."

There is additional testimony derogatory to both appellee and appellant, but it would serve no good purpose to recite it. It is sufficient to say that upon scrutiny of the evidence, it is apparent that the misconduct of each spouse toward the other culminated, as might have been expected, in their separation. Some might conclude that one was more at fault than the other, but the evidence sufficiently

shows that the misconduct·of each over the years materially contributed to their separation, whatever may have been the date or occasion on which they finally parted.

As the evidence was heard *ore tenus*, the decree of the chancellor is entitled to the same weight as a jury's verdict. *Arrington* v. *Arrington*, 196 Va. 86, 82 S. E. 2d 548; *Lowdon* v. *Lowdon*, 183 Va. 78, 31 S. E. 2d 271; *County Board* v. *Town of Fairfax*, 199 Va. 612, 101 S. E. 2d 519.

All conflicts in the evidence and all reasonable inferences deducible therefrom have been resolved against appellant on the issues other than that posed by appellee's allegations and prayer for a divorce, and the decree may not be reversed unless it is plainly wrong or without evidence to support it. Section 8-491, Code 1950; *Rogers* v. *Runyon*, 201 Va. 814, 113 S. E. 2d 679.

The question presented is not whether the evidence would have supported a finding of fact and a decree in favor of Todd, but whether the record contains substantial credible evidence which, upon application of correct principles of law, supports the finding and decree of the chancellor. *Barnes* v. *Moore*, 199 Va. 227, 98 S. E. 2d 683.

When the voluminous and contradictory evidence from which varying inferences may be drawn is measured by the principles announced in the foregoing decisions, and it is remembered that the principle of recrimination is applicable in divorce cases, we can not say that there is not sufficient credible evidence in the record to sustain the findings and the decree entered by the chancellor.

■ The next question is whether or not appellee should have been awarded any alimony.

Both litigants are 53 years old. Appellee's net worth is about $62,500, part earned by her in recent years from buying and selling property. Appellant, a graduate of Cornell University, is employed in Newport News at a yearly salary of about $7,000; his net worth is $100,000. Both were badly injured in the automobile accident, and recently appellee lost the sight of an eye, though not from the accident. The award of $75 per week does not indicate what part is alimony and what is support. However, Fred is now 20 years old, and it was stated at bar that he recently married so his support should be discontinued. We cannot say that awarding alimony was an abuse of discretion but as support for Fred is not now required, and the case is to be remanded, the chancellor may make such changes, if any,

in the award of alimony for appellee and support for Nancy as may be appropriate.

The final decree dismissed the bills but as some relief was awarded appellee and the case must remain upon the docket for entry of any further appropriate decrees, her bill should be reinstated. Nor is it amiss to say that § 20-91, Code 1950, was amended by Acts 1960, ch. 108, p. 121, and now when spouses live separate and apart for three years "without any cohabitation and without interruption," that constitutes grounds for divorce. Thus upon remand, both bills will be reinstated, and the litigants should be allowed to supplement or amend their pleadings and apply for such further relief as may be right and proper.

*Amended and affirmed.*